Next we'll hear LVL XIII v. Louis Vuitton. We have quite a crowd headed out, so we'll just wait a second. It's getting to be like the subway. That might be the first time the Second Circuit has been compared. No, we're happy to have a crowd. Good morning. Good morning. Ronald Coleman, Archer & Griner, for the appellant. Please, the Court. I think the most fruitful use of oral argument is to address the issues concerning the District Court's extensive weighing of evidence in the parts of the opinion granting summary judgment against my client concerning likelihood of confusion and the existence of acquired distinctiveness. There was a tremendous amount of evidence here, Internet-oriented social media evidence, celebrity endorsements, actual confusion, and the District Court found a way Did you get to the Polaroid factors, though? The Polaroid factors are always relevant on a likelihood of confusion issue. I know that, but there's two bases for the Court's decision, the trade dress decision in the first part. Oh, right. It indicates the need for a Polaroid analysis. Am I right about that? Well, we believe that our client's mark is inherently distinctive, and it would not require a Polaroid analysis at all. That is correct, Your Honor. I'd be happy to address that. It is well established that notwithstanding the troubling and sometimes vague distinction between trade dress and product configuration, questions about how exactly to apply that rule are constantly bubbling up through the courts, and there have been a number of contrary decisions. It is well understood that certain kinds of devices do qualify as labels. When they're used across an entire product line, that is signal number one that we're not talking about product configuration. The fact that a device is aesthetically pleasing is in and of itself also not outcome determinative on the question of whether or not it is a product, it is a brand or a source indicator as opposed to being ornamental. The district court used a very unusual formulation in determining that this could not be anything but product configuration. It relied on some very vague language and a not-precedential Federal Circuit decision, which was actually decided under Ninth Circuit law, which made a distinction between whether the device in question is a three-dimensional or a two-dimensional. We found it very difficult to understand how the court found this to even be a three-dimensional device or a three-dimensional design, but even to the extent that it is, there is no hard and fast rule. The court clearly relied on that rule here, so we think that was just simply a legal error that this court, with all due respect, we believe would be well-advised to address because this is the circuit in which trade dress and product configuration cases seem to come up the most. A case involving fashion design such as this one and involving a major fashion outlet such as this one does, where the district court relies on really an entirely inappropriate distinction between two- and three-dimensional designs, is very problematic. Having said that, we believe that the case should have gone to trial regardless of how the court analyzed the inherent distinctiveness issue on the acquired distinctiveness issue for the reasons that I just said. It is phenomenal, really, that the court was able to look at half a dozen detailed affidavits involving actual confusion and merely write them off by saying they are not probative or on the grounds that they were from people with pre-established relationships with the plaintiff. Are you suggesting that somebody who would pay $1,000 for a pair of sneakers wouldn't satisfy himself or herself as to who manufactured it? We're quite sure that they would, but this is a reverse confusion case. So our concern is not that people are going to buy Louis Vuitton thinking that they're buying level 13, but rather that what has happened here is that level 13 was prevented from the opportunity to develop its brand by being overwhelmed by Louis Vuitton's infringement. Louis Vuitton took the design that had been used by level 13, came out with sneakers that utilized the same design, and what these actual confusion affidavits said was I saw this, I'm in the industry, or I saw this and I'm familiar with this line of apparel, and I was certain that this was a joint venture between Louis Vuitton and level 13, which I know. I know level 13. I know Antonio Brown. I contacted Antonio or I contacted Antonio's people and asked them what's going on here. That isn't proof. That is certainly, if that's not proof, that certainly raises a fact question. I mean, there are many products by different manufacturers that look similar, and sometimes the purpose that it serves assures similarity in appearance. But shouldn't we look to the confusion of customers? Yes. And how could a customer who's spending $1,000 on a pair of sneakers not figure out who manufactured it? I mean, who would do that? Well, to the extent that the – I mean, I don't believe the district court concluded that because of the high level of expense of the product, that confusion was impossible. I grant you that. I'm just sort of asking the question because there's something inherently implausible about the idea that people are going to buy the most expensive form of a thing and not satisfy themselves as to who manufactured it. And yet, Your Honor – You buy a Lamborghini, you want it to be a Lamborghini, and you're not going to be mixed up and figured that it was made by Ford Corporation. Well, in fact, Your Honor, we have in trademark infringement, we routinely see that products that are extremely expensive, including many products that are manufactured by the appellee here, are nonetheless found to have been infringed, notwithstanding the fact that some degree of evaluation by the customer would lead to the conclusion that it's not the genuine article. The question is, under Polaroid, that is a factor, the degree of consumer sophistication. That is a factor. Here, again, it's a reverse confusion case, and the damage is not – it's not a passing off situation. In other words, people went into a store thinking they were buying level 13 sneakers, and instead they bought those junky old Louis Vuitton sneakers. That's not the case. We're saying here, retailers said to my client, we can't carry your line anymore. People think it's Louis Vuitton. I don't know whether it is Louis Vuitton. All I know is this is a problem for us. This is something we don't want to get involved in. Clearly, there's going to be some kind of lawsuit, or there is a lawsuit. We don't want to be involved. That's the damage. It's a different kind of damage from passing off. It's not a passing off case. It's reverse confusion. I see I'm out of time for my – Good morning, Your Honors. May it please the Court. My name is Robert E. Shapiro, and I represent the defendants' appellees in this case, Louis Vuitton Malattie and Louis Vuitton North America, Inc. Your Honors, if I may pick up on what Judge Joni asked at the very beginning, yes, there are two requirements that level 13 needed to meet in order to be able to bring a trademark claim in this case. The first and foremost is that they had to have evidence that they had actual intellectual property that they were entitled to enforce. And without that showing, without evidence to show that, they had no trademark upon which they could file a lawsuit in the first place. The second requirement is the one that Your Honor, Judge Jacobs, has mentioned several times, whether there was a likelihood of confusion here. And that's determined under the eight Polaroid factors that Judge Friendly has set out for doing that. And in this instance, level 13 lacked the evidence for both requirements. The failure of either one of them is fatal to their claim. And in this instance, they lacked the evidence for both. Now, the opinion by Judge Engelmeyer below is actually just a model of exactly what the Court has asked for in situations like this. Judge Engelmeyer went through meticulously what the evidence was, what was actually in the record, and what had level 13 brought to bear in order to be able to sustain a claim. Did he just rely on this two- or three-dimensional analysis? No, Your Honor. It's interesting. If you go through Judge Engelmeyer's decision, that's not what he relied upon. This is something that he mentioned, as many courts have mentioned, including the Supreme Court in Walmart v. Samara Brothers. The point he was making is this. There are two different types of trademarks now. One is the traditional trademark, which is to say a symbol or a word. And a second type of trademark is what tends to be called trade dress. He mentioned that the first type is ordinarily something that's two-dimensional and that the second type is something that's ordinarily three-dimensional, but he did not use that as the determining factor of what this was. Instead, he went and looked at the evidence, which is exactly what it is that you would want him to do. What was the evidence that he had? The evidence that he had was a whole series of things in the record and nothing to contradict it as to what this was. What was it? It was trade dress, the kind of trade dress we call product design trade dress. And he went through all the evidence, not relying upon this two-dimensional, three-dimensional analysis. There is no new bright-line test that he applied here. Instead, he looked at the evidence. Here was the evidence. Did the metal device contain the name of Level 13 on it? It did, Your Honor. That bears on several of the questions under the Polaroid factors as to whether there could be a likelihood of confusion, as has been decided. I think in the case in which you participated, the Playtex case, there it was actually the court said, where you have the literal element, the name of the company, that that is evidence against any kind of possibility of likelihood of confusion. And that's on the second part of the analysis, the likelihood of confusion circumstance. If I may go back to Judge Droney's question, the question is, what did the judge look at? This is what he looked at. The PTO understood this as product design trade dress. It said that repeatedly. Second, the reason why they understood it that way is that's what the application to the PTO said, that it was product design trade dress. Level 13, in filing its complaint, called it product design trade dress. Level 13, in its response to the Connor claim, said it was product design trade dress. Level 13's 30B6 witness, when asked to testify about what this is, acknowledged that it was a kind of product design trade dress. And if you actually look at the item itself, it becomes very clear that this is a product design. Now, what is it that they were arguing instead? They said, oh, it's product packaging. It's clearly not product packaging. Your Honor, Judge Jacobs, you mentioned in another case the landscape forums decision by Judge Oaks, but you were on the panel, that there's a difference between product packaging, which is the material that the product comes in, and the product itself. Pardon me? That's what you throw out. And this one, sure enough, came in a box. And their business plan actually identified the box, a special box that was being created. By the way, not with the toe plate design on it. A special box that was being created in order to sell the product. So what did you have here on the evidence? All of the evidence showed that this was product design trade dress. None of the evidence showed that it was product packaging, something to which you could apply an inherent distinctiveness analysis. So, under Samara Brothers, the Walmart versus Samara Brothers case, they needed to prove secondary meaning. And they did not have evidence of secondary meaning. One of the reasons they tried so hard to recharacterize it, I will say, because this came up very late in the case, one of the reasons they tried to recharacterize what it is that they were doing was they could not prove secondary meaning. First and foremost, this product was on the market for a very short period of time, and you will find no case in the Federal Reporters that in a period of time this short, with so little put into the advertising of the case, I'm sorry, of the product, you will not find any case in which secondary meaning is found. Secondary meaning is usually found after 10 years, 13 years. In the Louboutin case, 20 years. That's how secondary meaning develops, because what you're trying to show is that people all across the country who are potential consumers understand this as a designation of source and not just an appealing design. We have a giant population of people running out to buy $1,000 sneakers. We're talking about a very narrow strand of very well-heeled athletes. Well, that may be true, Your Honor, but it has to be nationwide. They have to have some showing that nationwide this product is appealing not for its design, but rather because of its identification of level 13 as the source. That's what they have to show. And they had no evidence of that. One of the things in their briefs that they say is, Judge Engelmeyer, too hidebound, not aware of current trends. There's a social media campaign that was done. In fact, the social media campaign was nonexistent. They never put in evidence a single tweet, a single social media posting of any kind that ever pointed to the toe plate as an identification of source. You have a question. Oh, I'm sorry, Your Honor. I was going to say that I thought that in addition on the question of secondary meaning, you were pointing us to evidence of toe plates on other shoes, not sneakers, but other shoes, so that it wasn't an unusual product design, at least for shoes.  No, you're correct, Your Honor, although that bears primarily on the strength of the mark analysis under the Polaroid factors. But, yes, there was a very high obstacle that they needed to overcome. And that high obstacle was that their toe plate somehow was understood by their designated demographic. They tried to change that periodically, but their designated demographic, as indicating level 13. Not that they found it appealing, but rather that that toe plate meant level 13. And they didn't have any evidence of that. They had zero evidence. And one of the reasons is that toe plates were used by large numbers of people. And there was plenty of evidence in the record, and the judge accepted the evidence, showing that it had been used on lots of other products, including products very similar to this one. So they had a very high burden to show. And the problem was they had no evidence of it. They had no evidence of secondary meaning. With respect to the likelihood of confusion factors, Your Honor, I agree with you. I think the sophistication of the consumers is very important. But every single one of the factors but one was found either in our favor or neutral. The mark was at a minimum, if there was one. I thought it was two that were at least neutral. Two neutral, yes, Your Honor. I apologize if I said otherwise. There were five factors that were found in our favor, the strength of the mark, the similarity, the confusing similarity, the question of actual confusion, the question of good faith, and finally the sophistication of the consumers. So for all those reasons, Judge Engelmeyer did not weigh evidence. He looked at what the evidence was. And then using the instructions that the court has applied, balanced the factors, found five opposing, one very weakly favoring, and on that basis said, there's not enough here for the case to go to the jury. So both on the existence of a trademark and on the likelihood of confusion, this case fails. If it fails on either, it fails completely. And it failed on both in this instance. So we ask that you affirm the decision of Judge Engelmeyer and the court below. Thank you very much, Your Honors. Shapiro. The judge did look at the evidence. He looked at it. He weighed it as if it were a bench trial. He took, again, Mr. Shapiro insists there was no evidence. The best evidence, it is found in a million cases, the best evidence of a likelihood of confusion is actual confusion. The district judge simply wrote off the actual confusion. He weighed the evidence and found it insufficient for reasons that would typically be left for a fact finder. Mr. Shapiro said that there's no evidence of any social media campaign. The court acknowledged that there were 50,000 followers of Mr. Brown's Instagram account, and the only reason they would be following him, the only reason anyone would ever have heard of him, would be because of the product that he was promoting. Whether or not there was some other reason, there was never any other reason in the record, and that's a fact question. That's not a question. That's not a summary judgment question. What about media coverage? I'm sorry? Media coverage. There was media coverage. There was media coverage in a number of magazines, fashion magazines, celebrity endorsements. Unsolicited? Some unsolicited. Much of it was. I couldn't stand here, Your Honor, specify which was unsolicited and which was solicited, but when we consider that those magazines included outlets such as Ebony, there's a point, you know, everyone is pitching stories to Ebony. To get a story into Ebony means that you're making some kind of splash. Again, these are questions that could be brought out in the course of a trial, but it's a matter of summary judgment to say that they don't raise a fact question on summary judgment. And finally, I just want to mention again Tom's Betts decision in the Seventh Circuit, because Your Honor brought up the question of whether or not the name was engraved on the trademark. The way the product is seen, it's virtually impossible to see the names, the screws, whether there are rounded corners or sharp corners. The court did not make the appropriate use of a side-by-side description here of the claimed marks, and we think that there is ample basis to reverse the decision here and remand for a trial. Thank you. Thank you. Thank you both. We'll reserve decision.